53 F.3d 911
 Pens. Plan Guide P 23907Y
Joan Valentine MOHAMED, formerly known as Joan Valentine
Kerr, Appellee,
v.
Kevin Scott KERR; Ivan S. Kerr, Estate of, Appellants.
UNUM Life Insurance Company, of America, a Maine
corporation, Defendant.
 No. 94-2953.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Feb. 15, 1995.
Decided April 27, 1995.
 
 Robert B. Fine, Minneapolis, MN, argued, for appellant.
 Mark C. McCullough, Minneapolis, MN, argued, for appellee.
 Before BOWMAN, BEAM, and HANSEN, Circuit Judges.
 BOWMAN, Circuit Judge.
 
 
 1
 The estate of Ivan S. Kerr and its personal representative, Kevin Scott Kerr (collectively, the estate), appeal from the decision of the District Court granting Joan Valentine Mohamed's motion for summary judgment and denying the estate's motion for summary judgment. We reverse.
 
 
 2
 Mohamed and Ivan Kerr were married on March 1, 1985. In December 1986, Mohamed completed an enrollment form for Kerr's participation in his employer's flexible benefits plan. On that form, Mohamed was designated as beneficiary of the $265,000.00 in group life insurance benefits;[1] no contingent beneficiary was named and the form was unsigned. On January 9, 1987, Kerr was terminated from his job. In February 1988, he was diagnosed with presenile dementia, Alzheimer's disease.
 
 
 3
 In June 1988, Mohamed petitioned the probate court for appointment of a general conservator for Kerr and his estate. In July, she began proceedings to dissolve the marriage, and in August a conservator was appointed. The dissolution was final in December 1988. In paragraph 7 of the Marriage Termination Agreement,[2] Mohamed and Kerr stipulated as follows:
 
 
 4
 That each of the parties shall be awarded full right, title, interest and equity in and to the bank accounts, stocks, bonds, savings accounts, pensions, retirement plans, combined IRAs, mutual funds, life insurance policies with any cash value thereon, limited and general partnership interests, and any other assets which are held in their name or for their benefit as of the date of this Marriage Termination Agreement, free and clear of any claim by the other party.
 
 
 5
 It is undisputed that Mohamed remarried soon after her divorce from Kerr was final, and she apparently did not visit Kerr between the time she left him and his death on January 8, 1992.
 
 
 6
 After Kerr died, Mohamed sued UNUM Life Insurance Corporation of America, the employer's group life insurance carrier, in state court seeking to compel UNUM to pay the insurance proceeds to her. Because Kerr's estate also claimed the policy benefits, UNUM removed the action to federal court, brought a motion for judgment in interpleader, and deposited the insurance proceeds with the court.[3] The estate and Mohamed filed cross-motions for summary judgment. Judgment was granted to Mohamed, and the estate appeals.
 
 
 7
 We review a decision to grant summary judgment de novo. We will affirm only if we agree that there are no genuine issues of material fact and that Mohamed is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c).
 
 
 8
 The estate raises seven "issues" on appeal, which are more properly characterized as arguments that can be distilled into one issue, the resolution of which will dictate the result: Did paragraph 7 of the Marriage Termination Agreement entered into by Mohamed and Kerr operate to nullify the earlier designation, made when the couple was married, of Mohamed as beneficiary of Kerr's group life insurance policy?[4]
 
 
 9
 Before we proceed to the merits, it is necessary for us to resolve the question of what law controls. The estate challenges the District Court's decision "for failure to apply current Minnesota law," Appellants' Brief at 11A, and Mohamed says the court "correctly applied federal and state law," Appellee's Brief at 2. (The District Court itself said that it was applying federal common law.) Neither party has demonstrated a clear understanding of how a federal court determines the law to apply in a case such as the one before us.
 
 
 10
 Although it seems logical that state law would control, the interpretation of a marital termination agreement ordinarily being a matter of state law, that is not the case here. The group life insurance policy at issue is an employee welfare benefit plan, and the case is in federal court because the plan is regulated by the Employee Retirement Income Security Act (ERISA), 29 U.S.C. Secs. 1001-1461 (1988 & Supp. V 1993). See American Airlines, Inc. v. Wolens, --- U.S. ----, ----, 115 S.Ct. 817, 825, 130 L.Ed.2d 715 (1995) (noting in dicta that ERISA "does channel civil actions into federal courts under a comprehensive scheme, detailed in the legislation, designed to promote 'prompt and fair claims settlement' ") (citation omitted) (quoting Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 54, 107 S.Ct. 1549, 1556-57, 95 L.Ed.2d 39 (1987)). In this case, no cause of action was stated under an ERISA provision, and the parties are not claiming that a particular ERISA section expressly governs the issue before us. Therefore, we are compelled to look to federal common law. See Pilot Life Ins. Co., 481 U.S. at 56, 107 S.Ct. at 1557-58; Reid v. Connecticut Gen. Life Ins. Co., 17 F.3d 1092, 1098 (8th Cir.1994) ("where there is no federal statutory law to apply in ERISA litigation, 'federal common law,' not state law, should be applied"). The federal courts may look to state law for guidance in developing federal common law, but it is inappropriate to apply state law if it conflicts with ERISA or its underlying policies. Brewer v. Lincoln Nat'l Life Ins. Co., 921 F.2d 150, 153 (8th Cir.1990), cert. denied, 501 U.S. 1238, 111 S.Ct. 2872, 115 L.Ed.2d 1038 (1991); see also Pilot Life Ins. Co., 481 U.S. at 56, 107 S.Ct. at 1557-58 ("The expectations that a federal common law of rights and obligations under ERISA-regulated plans would develop ... would make little sense if the remedies available to ERISA participants and beneficiaries under Sec. 502(a) [29 U.S.C. Sec. 1132(a), the civil enforcement provisions of ERISA] could be supplemented or supplanted by varying state laws.").
 
 
 11
 Each party is adamant about its own citation of "controlling" law--one a Minnesota appeals court case and the other an Eighth Circuit case--because each believes its key case will win the day for the party that relies upon it. We do not believe, however, that the two cases compel different results.
 
 
 12
 The estate believes that Larsen v. Northwestern National Life Insurance Co., 463 N.W.2d 777 (Minn.Ct.App.1990), review denied (Minn. Feb. 6, 1991), controls, and that the result it seeks in this case is bolstered (if not ordained) by the teachings of that case. In Larsen, the decedent designated her husband to be the beneficiary of an insurance policy on her life. Nearly five years later, the couple divorced. Pursuant to a stipulated property settlement incorporated into the divorce decree, decedent and her husband were "awarded all right, title and interest in those life insurance policies covering his or her respective life." Id. at 780 (quoting the stipulation). Decedent died less than two months after the dissolution was final without changing the beneficiary (although there was evidence that she intended to), and her former husband claimed he was entitled to the proceeds of the life insurance policy.
 
 
 13
 The court held that, despite the absence of a specific reference in the stipulation to the beneficiary interests of the life insurance policies, the language "granting 'all right, title and interest ' contemplated rights beyond the cash surrender value of the policy or the right merely to receive physical delivery of the policy," and included the divestment of the former spouses' beneficiary rights in each other's life insurance policies. Id. The court further found that "the stipulation and dissolution decree adequately demonstrated decedent's intent that she no longer wished her ex-husband to have any interest in her life insurance policy," and decided it must "give effect" to that intention. Id. at 781. It is obvious why the estate would prefer that Larsen control the result in this case.
 
 
 14
 Mohamed directs our attention to Lyman Lumber Co. v. Hill, 877 F.2d 692 (8th Cir.1989). Lyman, a case on appeal from federal district court in Minnesota, concerned an ERISA-regulated employee profit-sharing plan. Decedent designated his wife as beneficiary of his profit-sharing plan five years before the couple was divorced. The divorce decree stated that decedent "shall have as his own, free of any interest of [his former spouse], his interest in the profit-sharing plan of his employer." Id. at 693 (quoting the decree) (alteration by this Court). Applying federal common law, the Court concluded that the divorce decree gave the decedent "his entire interest in the Plan free of any interest of" his former wife, but did not "specifically refer to and modify the beneficiary interest." Id. at 693, 694. The Court noted that it was indeed possible for a property settlement entered into pursuant to a dissolution of marriage to revoke a former spouse as beneficiary, but "only by terms specifically divesting the spouse's rights as a beneficiary under the policy or plan." Id. at 693. The settlement at issue in the case, the Court held, had not done so.
 
 
 15
 Thus, under federal common law, a settlement entered into pursuant to a judgment of dissolution may divest a former spouse of beneficiary rights to life insurance proceeds, even when the beneficiary designation has not been changed before the death of the insured. Cf. Metropolitan Life Ins. Co. v. Hanslip, 939 F.2d 904, 907 (10th Cir.1991) (stating that "absent any applicable divorce decree dictating otherwise," the former spouse who was the designated beneficiary was entitled to life insurance proceeds, given that state statute requiring otherwise was preempted by ERISA). Larsen, then, is clearly in accord with the body of federal common law on this issue. That case applied the same rule of law as Lyman--that a property settlement entered into pursuant to a dissolution may divest former spouses of beneficiary rights in each other's life insurance policies, if the agreement makes it clear that the former spouses so intend. There is no inherent conflict in the law set forth in the two decisions, nor does Larsen conflict with the policies of ERISA. Because Lyman and Larsen had different facts, however, the cases had different results. Here, it is Kerr's and Mohamed's application of the law to the facts of this case that are in conflict, not the law that is to be applied.
 
 
 16
 The question remains for us to decide, based on the record before us in this fact-driven determination, whether the Kerr settlement "specifically divest[ed] the spouse's rights as a beneficiary under the policy." Lyman, 877 F.2d at 693. Mohamed would have us read this standard to require that the property settlement explicitly mention the beneficiary interest, in order to "specifically divest" her of that interest. The Lyman Court, while noting that the decree at issue did not "specifically refer to and modify the beneficiary interest," id. at 694, did not elaborate upon the sort of specificity that would be required to divest a former spouse of a beneficiary interest via a divorce decree. The federal common law as it has developed since Lyman was decided, however, makes it clear that the law does not require that the word "beneficiary" appear in the language of the agreement in order for a beneficiary interest to be divested.
 
 
 17
 In 1990, the Seventh Circuit en banc affirmed a district court decision that the Lyman opinion cites. Fox Valley & Vicinity Constr. Workers Pension Fund v. Brown, 897 F.2d 275 (7th Cir.) (en banc), cert. denied, 498 U.S. 820, 111 S.Ct. 67, 112 L.Ed.2d 41 (1990). In Fox Valley, the following language in a property settlement, agreed to pursuant to a divorce, was held to have operated as "an explicit mutual waiver," id. at 280, of former spouses' rights to each other's pension plan benefits: "The parties each waive any interest or claim in and to any retirement, pension, profit-sharing and/or annuity plans resulting from the employment of the other party." Id. at 277 (quoting the property settlement). The court held as it did even though the former spouse still was the named beneficiary of the benefits when her ex-husband died, and in spite of the fact that the beneficiary interest was not specifically mentioned in the settlement. As in the Larsen stipulation and the Kerr agreement, but unlike the Lyman decree, the divestment of rights was not one-sided but mutual. Each party gave up any interest in the other's assets. Moreover, on another point that distinguishes the Fox Valley and the Kerr agreements from the Lyman decree, the parties gave up not only present "interest" but any future "claim" (such as a claim one otherwise might have as the named beneficiary of life insurance proceeds when an insured former spouse dies).
 
 
 18
 In Brandon v. Travelers Insurance Co., 18 F.3d 1321 (5th Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 732, 130 L.Ed.2d 635 (1995), the court held that language awarding to the decedent as his sole and separate property "[a]ny and all sums ... and any other rights relating to any" employee benefit plan, and divesting the wife "of all rights, title, interest, and claim in and to such property," id. at 1323 (quoting the divorce decree), was effective as an "explicit, voluntary [waiver of ERISA benefits] made in good faith," id. at 1327. It is plain that the language in the Brandon decree, like that in the Fox Valley agreement (and the Larsen stipulation, for that matter), is more akin to the Kerr language than that found in the Lyman decree. In Brandon, there was no mention of beneficiary interests as such, but "all rights, title, interest, and claim" was determined to include any beneficiary interest. We hold that the language "full right, title, interest and equity" that appears in paragraph 7 of the Kerr Marriage Termination Agreement comprehends any beneficiary interests or rights, notwithstanding that they are not expressly mentioned.
 
 
 19
 Unlike the situation in Lyman, where only one well-defined asset was at issue, the language of paragraph 7 was broad, general, and obviously intended to be inclusive. In Lyman it would have been a simple matter to identify with some specificity the rights and interests attached to one asset and to allocate them between the parties. Such was not the case with the Kerr agreement, where potentially many different assets were being divided. We also think it significant that, if the Kerr agreement did not divest Mohamed of her beneficiary interest in the UNUM policy, then the language of paragraph 7 is meaningless as to that policy. If we construe the agreement as Mohamed suggests, then it did nothing but possibly give Kerr a right to physical possession of the life insurance policy--a right so meaningless as not to be a right at all--and the ability to change the beneficiary--a right he had regardless of the divorce. See Larsen, 463 N.W.2d at 780 (concluding that the language of the decree at issue was intended to include more than life insurance policy's cash surrender value and physical delivery of the policy to the insured).
 
 
 20
 Apart from the actual language of the Kerr Marriage Termination Agreement, we believe that the facts surrounding the Kerrs' divorce are especially compelling for our conclusion that the agreement evidenced a mutual intent to divest. At oral argument, counsel for Mohamed acknowledged that Kerr's Alzheimer's disease precipitated Mohamed's decision to divorce Kerr. Once Kerr was diagnosed with the disease, Mohamed could not get away fast enough, and she never looked back. We do not believe it is putting too fine a point on it to say that she abandoned him to his illness. The marriage lasted only a bit more than three years, and the couple had no children together. Once the divorce was final all ties between Mohamed and Kerr were severed.
 
 
 21
 There is no indication in the record that Mohamed was responsible, after the divorce, for expenses associated with Kerr's care, medical treatment, or funeral, for which life insurance proceeds might be needed. Evidently the estate paid for those items. Moreover, the life insurance proceeds were not required for Mohamed's ongoing support. There were no children of the marriage whose subsistence was threatened by Kerr's death, and because no maintenance was awarded to Mohamed, she did not feel the loss of any income (or anything else, apparently) when Kerr died; in fact, she remarried soon after the divorce and well before Kerr's death. Mohamed suffers no hardship from the result we reach today.
 
 
 22
 Mohamed argues that paragraph 7 of the Marriage Termination Agreement does not reflect the intent or expectations of herself or of Kerr as regards the UNUM policy, because Kerr's conservator was unaware of the UNUM policy and because Mohamed claims that she had become unaware of it by the time of the divorce. We disagree. The language of the Marriage Termination Agreement, although it does not mention the UNUM policy, is clear: Kerr and Mohamed agreed to be divested of any interest in and claim to all of each other's life insurance policies. Given the agreement's comprehensive language, it is clear that Mohamed did not intend or expect to be the beneficiary of any policy owned by Kerr and insuring Kerr's life. She took what she could from the marriage and walked away with no further interest in or contact with Kerr--until her recollection about the UNUM insurance policy was refreshed. We think it disingenuous of Mohamed to suggest that she expected or intended to remain the beneficiary of a life insurance policy, while simultaneously claiming to have had no knowledge of that policy when she agreed to mutual divestment of beneficiary interests in all life insurance policies. The parties clearly intended this paragraph as a "catch-all" disposition of all "paper" assets of the couple not otherwise specifically divided. The failure of the Marriage Termination Agreement to specifically mention the UNUM policy is of no consequence when the divestment is as sweeping as the one set forth here. The termination agreement did not define in detail any of the enumerated assets, including the life insurance policies that Mohamed was able to recall at the time of the divorce, but reflects the parties' intent that all such assets as generally described be mutually divested.
 
 
 23
 Notwithstanding the fact that we are applying federal common law to the construction of this property settlement language, we note, as did the Fifth Circuit in Brandon, that "[f]ederal respect for state domestic relations law has a long and venerable history." Brandon, 18 F.3d at 1326. We have before us a provision of a Marriage Termination Agreement that, given the circumstances of this case, is quite clear. It is a mutual and complete divestment of present interests and future claims in the enumerated assets. This divestment was agreed to by the parties voluntarily and in good faith, and was approved by the state court judge who awarded the judgment of dissolution. We see no reason not to give effect to it. "The oversight of the family courts is suitably armored to protect the rights at stake in this case and we find the approach of this opinion preferable to asserting that ERISA should act as a surrogate law of divorce." Id. at 1327.
 
 
 24
 Finally, the District Court held, and Mohamed agrees, that in any event Mohamed is entitled to the proceeds of the UNUM policy because the policy is not one of the assets described in paragraph 7 of the Marriage Termination Agreement, to wit, it is not a "life insurance polic[y] with any cash value thereon." Mohamed sees the phrase "with any cash value thereon" as a modifier of "life insurance policies," and thus argues that term life insurance policies, such as the UNUM policy, are not included in the assets itemized in paragraph 7. We disagree. Clearly, the Marriage Termination Agreement, and paragraph 7 in particular, were intended to be, and should be read as, disposing of all claims of the divorcing parties against each other's property. Restricting the definition of life insurance policies as Mohamed suggests would fail to give effect to the agreement. We think the phrase "with any cash value thereon" should be read, as a matter of law, to mean "together with any cash value thereon." That is, the phrase dealing with life insurance should not be taken out of context and read to restrict the type of life insurance policies to which the language of divestment applies, in light of the remainder of the paragraph and its extraordinarily comprehensive language affecting the assets of both parties.
 
 
 25
 The judgment of the District Court is reversed and the case is remanded with directions to enter summary judgment for the estate.
 
 
 
 [1]
 In completing the form, Mohamed indicated that Kerr had selected $279,000.00 in life insurance coverage. The form specified, however, that interim coverage for that selection would be $265,000.00. The benefit would increase only when the insurance company received evidence of insurability, and it never did. In the District Court, Mohamed nevertheless sought payment to her of the higher benefit. The court determined that coverage was for the lesser amount, a decision that is not appealed
 
 
 [2]
 The language of paragraph 7 of the Marriage Termination Agreement is also found, without material alteration, in paragraph 8 of the Conclusions of Law that constituted the final judgment and decree of dissolution
 
 
 [3]
 The court awarded UNUM its attorney fees and costs in defending the action. That decision is not appealed
 
 
 [4]
 Among its issues, the estate claims that the court erroneously decided that a material fact was undisputed: whether or not Mohamed knew of the UNUM group life insurance policy when she signed the 1988 termination agreement that divided the marital property, or, more accurately, whether or not she remembered the policy, since she clearly knew about it in 1986. Resolution of any dispute about this fact is unnecessary to our holding, and so it is not a material fact. Thus a dispute about this question of fact would not preclude summary judgment