******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

CARLTON E. BEYOR *v.* LAURA PAVANO BEYOR
(AC 36546)

Beach, Keller and Harper, Js.

*Argued March 11—officially released July 28, 2015*

(Appeal from Superior Court, judicial district of
Windham, Fuger, J.)

*Robert D. Zaslow*, for the appellant (defendant).

*Rachel Kittredge Shipman*, with whom, on the brief,
was *Ross G. Fingold*, for the appellee (plaintiff).

*Opinion*

BEACH, J. In this dissolution action, the defendant, Laura Pavano Beyor, appeals from the judgment of the trial court dissolving her marriage to the plaintiff, Carlton E. Beyor, and enforcing a premarital agreement (agreement) that was entered into by the parties. The defendant claims that the court erred in enforcing it because the agreement was unconscionable at the time of enforcement. We affirm the judgment of the trial court.

The parties entered into the agreement on August 7, 2006, four days prior to their wedding ceremony. In the agreement, each party waived any claim he or she may have had to the property of the other, and each party waived any ability to receive alimony or other support, in the event of the dissolution of their marriage. The plaintiff commenced this marital dissolution action in October, 2010. By way of a pendente lite motion, the plaintiff sought enforcement of the agreement. The defendant filed an objection to that motion, arguing that the agreement was unconscionable and thus unenforceable. Following an evidentiary hearing, the court, *Fuger, J.*, issued a memorandum of decision on November 29, 2011. The court found the following facts. In 2006, the defendant was employed, earning approximately $30,000 per year. She owned a home in Plainville, which she sold after the marriage. She "cleared" approximately $44,000 from the sale of the house. At that time, the plaintiff had an income of approximately $250,000 per year and had stock holdings valued at approximately $650,000. Following the marriage, the defendant ceased working and moved into a house owned solely by the plaintiff. At the time of the hearing, the plaintiff's net worth was approximately $4.5 million and the defendant's net worth was approximately $26,000. Both parties were in reasonably good health, consistent with their ages, and capable of performing substantial gainful employment. The defendant was the first to mention that a prenuptial agreement would be acceptable to her. At the time of the execution of the agreement, both parties were represented by attorneys, who had ample opportunity to review the agreement.

In its November 29, 2011, memorandum of decision, the court disagreed with the defendant's contention that the agreement was unconscionable and thus unenforceable under General Statutes § 46b-36g (a) (2). The court examined the agreement to determine unconscionability both at the time of its execution in 2006, and at the time enforcement was sought, in 2011. It determined that at neither point was the agreement or its enforcement unconscionable. The court noted that the plaintiff was wealthy in both 2006 and 2011, and, although the defendant had much more modest means than the plaintiff had at both times, the court found that the disparity in wealth between the parties was substantially the

same in 2011 as it had been in 2006. The court found that the agreement was not forced upon the defendant. She had "ample opportunity to review and understand the agreement and indeed, made productive use of that opportunity." The court found that at the time of execution of the agreement, the defendant was represented by legal counsel, and there had been full disclosure by the parties as to their respective financial situations. The court noted, with regard to the situation in 2011, that although "there certainly are some arguments to be made that the plaintiff is lacking in chivalry and respect for the woman that he claimed to love in 2006 when he seeks to remove her from his life with no economic support considering the five years they spent together, there is, given the prenuptial agreement, no requirement that he do so. The defendant, although five years older, is not unemployable, medically disabled, nor lacking in skills that would permit her to be self-sufficient. She will not become destitute and a ward of the state if the prenuptial agreement is enforced against her,[1] although the financial quality of her life will undoubtedly diminish."

The defendant filed a motion to reargue, claiming that *Oldani* v. *Oldani*, 132 Conn. App. 609, 34 A.3d 407 (2011), which was released shortly after the trial court's November 29, 2011 decision, required a finding that the agreement was unenforceable under § 46b-36g (a) (3) because of the plaintiff's omission of his Schedule E income from his financial disclosure at the time the agreement was executed. The court, *Fuger, J.*, denied the motion. In January, 2014, the court, *Boland, J.*, issued a decision dissolving the parties' marriage and upholding the agreement.[2] This appeal followed.

The defendant first claims that the court erred in determining that, contrary to the provisions of § 46b-36g (a) (2), the parties' agreement was enforceable in July, 2011, when the plaintiff sought to enforce its terms. We disagree.

"[A] court's determination whether a prenuptial agreement is unenforceable pursuant to § 46b-36g presents a mixed question of fact and law over which our review is plenary. . . . In reviewing the court's decision, we must therefore determine whether the court's conclusions are legally and logically correct and supported by the facts in the record." (Citation omitted; internal quotation marks omitted.) Id., 615.

"[A]n antenuptial agreement is a type of contract and must, therefore, comply with ordinary principles of contract law. . . . [A]ntenuptial agreements are to be construed according to the principles of construction applicable to contracts generally. . . . [A]ntenuptial agreements relating to the property of the parties, and more specifically, to the rights of the parties to that property upon the dissolution of the marriage, are generally enforceable . . . [if] the circumstances of the

parties at the time the marriage is dissolved are not so beyond the contemplation of the parties at the time the contract was entered into as to cause its enforcement to work injustice. . . . [T]he party seeking to challenge the enforceability of the antenuptial contract bears a heavy burden. . . . This heavy burden comports with the well settled general principle that [c]ourts of law must allow parties to make their own contracts. . . . It is established well beyond the need for citation that parties are free to contract for whatever terms on which they may agree. . . . Whether provident or improvident, an agreement moved on calculated considerations is entitled to the sanction of the law . . . ." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *Schoenborn* v. *Schoenborn*, 144 Conn. App. 846, 853–54, 74 A.3d 482 (2013).

Prenuptial agreements entered into on or after October 1, 1995, are governed by the Connecticut Premarital Agreement Act, General Statutes § 46b-36a et seq.[3] See *Friezo* v. *Friezo*, 281 Conn. 166, 182, 914 A.2d 533 (2007). Section 46b-36g (a) (2) provides in relevant part: "A premarital agreement or amendment shall not be enforceable if the party against whom enforcement is sought proves that . . . [t]he agreement was unconscionable when it was executed or when enforcement is sought . . . ."

"Unconscionable is a word that defies lawyer-like definition. . . . The classic definition of an unconscionable contract is one which no man in his senses, not under delusion, would make, on the one hand, and which no fair and honest man would accept, on the other. . . . The doctrine of unconscionability, as a defense to contract enforcement, generally requires a showing . . . of an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party . . . . The purpose of the doctrine of unconscionability is to prevent oppression and unfair surprise." (Citations omitted; internal quotation marks omitted.) *McKenna* v. *Delente*, 123 Conn. App. 146, 158, 2 A.3d 38 (2010). "[T]he question of unconscionability is a matter of law to be decided by the court based on all the facts and circumstances of the case." (Internal quotation marks omitted.) *Crews* v. *Crews*, 295 Conn. 153, 163, 989 A.2d 1060 (2010).

The defendant argues that the enforcement of the agreement in 2011 was unconscionable. The defendant was to receive no alimony, despite the discrepancy in the parties' income and net worth. The defendant had sold her house after the parties were married, and she lived in the plaintiff's house. The defendant had no funds with which to secure a residence. Section 13.1 of the agreement provided that the parties were to reside at the plaintiff's residence following their marriage, and, if the marriage were to end, the defendant

was to vacate the residence within sixty days.

The parties, however, had mutually agreed to the terms of the agreement. At the time the agreement was entered into, there was a marked discrepancy in the parties' income and net worth;[4] the discrepancy existed to a greater extent at the time of enforcement. The court found that at the time of execution, the defendant earned approximately $30,000 per year, and at the time of enforcement, she had a net worth of approximately $26,000. The court further found that at the time the agreement was executed, the plaintiff had an income of approximately $250,000 per year and stock holdings of approximately $650,000, and at the time of enforcement, he had a net worth of approximately $4.5 million. The court found that the disparity in the parties' financial situations was "substantially the same" at the time of execution and at the time of enforcement.

In *Winchester* v. *McCue*, 91 Conn. App. 721, 725, 882 A.2d 143, cert. denied, 276 Conn. 922, 888 A.2d 91 (2005), the plaintiff argued on appeal that the trial court erred in enforcing the parties' prenuptial agreement and that "enforcement of the agreement would be unconscionable because the defendant's financial situation at the time of dissolution was beyond the contemplation of the parties when the agreement was executed." This court in *Winchester* analyzed the plaintiff's claim under the third prong of *McHugh* v. *McHugh*, 181 Conn. 482, 489, 436 A.2d 8 (1980), which provides that a prenuptial agreement will not be enforced "where the circumstances of the parties at the time of the dissolution are so far beyond the contemplation of the parties at the time the agreement was made as to make enforcement of the agreement work an injustice. . . . [W]here the economic status of parties has changed dramatically between the date of the agreement and the dissolution, literal enforcement of the agreement may work injustice. Absent such unusual circumstances, however, [prenuptial] agreements freely and fairly entered into will be honored and enforced by the courts as written." (Internal quotation marks omitted.) *Winchester* v. *McCue*, supra, 91 Conn. App. 729–30; see *Friezo* v. *Friezo*, supra, 281 Conn. 186 n.23 (*McHugh* standards codified in Connecticut Premarital Agreement Act). This court concluded that the trial court properly rejected the plaintiff's claim that the agreement should not be enforced because the parties could not have contemplated that the defendant's estate would increase by approximately 430 percent over the course of the marriage. *Winchester* v. *McCue*, supra, 730. This court stated that the threshold for finding an extraordinary change in economic status is high, and that "[t]he court [in *McHugh*] made clear that the change must be so far beyond the contemplation of the parties . . . as to make enforcement of the agreement work an injustice. . . . The . . . economic status must have changed dramatically and that a finding that such

change has occurred would be an unusual [circumstance]. . . . We agree with the trial court that it must have been contemplated by the parties that the defendant would continue working in the corporate arena and that, over the course of years, his income would increase as well as his retirement benefits and investments. These circumstances do not constitute the type of dramatic or unusual circumstances contemplated by *McHugh*." (Citations omitted; internal quotation marks omitted.) Id., 730–31.

Similarly, the relative economic status of the parties has not changed dramatically in the present case. The court's finding that the disparity in income between the parties was substantially similar is supported by factual findings that are not clearly erroneous. Although the gross difference in affluence widened, the fact that the plaintiff was far wealthier than the defendant did not change. Accordingly, as in *Winchester*, the circumstances of this case are not of the type contemplated by *McHugh*. Furthermore, "Unfairness or inequality alone does not render a postnuptial[5] agreement unconscionable; spouses may agree on an unequal distribution of assets at dissolution. [T]he mere fact that hindsight may indicate the provisions of the agreement were improvident does not render the agreement unconscionable. . . . Instead, the question of whether enforcement of an agreement would be unconscionable is analogous to determining whether enforcement of an agreement would work an injustice. . . . Marriage, by its very nature, is subject to unforeseeable developments, and no agreement can possibly anticipate all future events. Unforeseen changes in the relationship, such as having a child, loss of employment or moving to another state, may render enforcement of the agreement unconscionable." (Citations omitted; internal quotation marks omitted.) *Bedrick* v. *Bedrick*, 300 Conn. 691, 705–706, 17 A.3d 17 (2011). The trial court made no findings of unforeseen developments. Although the plaintiff had increased his net worth during the marriage, so that the gap widened, the fundamental nature or quality of the difference in economic status had not changed. At both times, the plaintiff had much more money than the defendant; and as noted previously, the defendant had expressly recognized in the agreement that a substantial difference in resources existed, and she nevertheless executed the agreement.

The defendant next argues that the court, *Fuger, J.*, abused its discretion in denying her motion to reargue and that the court, *Boland, J.*, erred in incorporating Judge Fuger's November 29, 2011 ruling into its judgment of dissolution[6] because the plaintiff had not provided adequate financial disclosure at the time the agreement was signed. The defendant argues that the income discrepancy between the parties "is more untenable" because at the time of execution in 2006, the plaintiff failed to disclose significant perennial Schedule

E income. The defendant contends that the plaintiff's tax returns demonstrate that in 2006 he had Schedule E income of $394,048, which he did not include in his financial disclosure at the time. The defendant argues that reversal of the present case, therefore, is required by *Oldani* v. *Oldani*, supra, 132 Conn. App. 614–25.

Section 46b-36g (a) (3) provides in relevant part that "[a] premarital agreement or amendment shall not be enforceable if the party against whom enforcement is sought proves that . . . [b]efore execution of the agreement, such party was not provided a fair and reasonable disclosure of the amount, character and value of property, financial obligations and income of the other party . . . ." The phrase "fair and reasonable disclosure" as used in § 46b-36g (a) (3) "refers to the nature, extent and accuracy of the information to be disclosed, and not to extraneous factors such as the timing of the disclosure." *Friezo* v. *Friezo*, supra, 281 Conn. 183. "[F]inancial disclosures by parties to a prenuptial agreement are not required to be exact or precise . . . rather . . . a fair and reasonable financial disclosure requires each contracting party to provide the other with a general approximation of their income, assets and liabilities, and . . . a written schedule appended to the agreement itself, although not absolutely necessary, is the most effective method of satisfying the statutory obligation in most circumstances." (Citations omitted; internal quotation marks omitted.) *Oldani* v. *Oldani*, supra, 132 Conn. App. 619.

In *Oldani*, the defendant argued that the trial court erred in determining that the parties' prenuptial agreement was enforceable because, before the execution of the agreement, the plaintiff had failed to provide to her with a "fair and reasonable disclosure" of his income in that his financial affidavit insufficiently disclosed his income pursuant to § 46b-36g (a) (3). Id., 615–16. The plaintiff in that case appended a financial disclosure to the prenuptial agreement, but the disclosure did not "expressly identify the amount of net income that he had received or was entitled to receive as a result of his various real estate investments. The schedule [did] not provide any formula or directions for calculating the plaintiff's share of the rental income. The schedule [did] not contain a statement or figure that represents the plaintiff's income at the time. In fact, the word 'income' [did] not appear on any of the pages of the plaintiff's financial disclosure." Id., 621. This court analyzed the meaning of the phrase "fair and reasonable disclosure" within the statutory scheme and concluded that "[§] 46b-36g (a) (3) nevertheless provides that a prenuptial agreement is unenforceable unless, prior to execution of the agreement, each party gives a fair and reasonable disclosure of the amount, character and value of property, financial obligations and income. . . . Our Supreme Court has determined that, to be fair and reasonable, a party's disclosure does

not need to be exact but must at least provide a general approximation. Focusing on the information disclosed by the plaintiff, our plenary review of the record reveals that, although the plaintiff may have provided a sufficient approximation of his property holdings and other financial obligations, he failed to provide the defendant with sufficient information regarding his income prior to her signing the prenuptial agreement. Because the plaintiff failed to meet this burden to inform, it was not legally and logically correct for the court to have determined that the prenuptial agreement was enforceable. Accordingly, we reverse that portion of the court's dissolution judgment." (Emphasis omitted; internal quotation marks omitted.) Id., 624.

Financial disclosures need not be "exact or precise," but rather a "fair and reasonable" disclosure must provide a "general approximation" of income, assets, and liabilities. *Friezo* v. *Friezo*, supra, 281 Conn. 189, 191. What is "fair and reasonable" may depend on the circumstances presented. In *Oldani*, the plaintiff did not list his income on his financial disclosure. *Oldani* v. *Oldani*, supra, 132 Conn. App. 620. Moreover, the parties had an issue regarding a minor child at the time of enforcement, and the prenuptial agreement provided for some alimony. Id., 611–12. Unlike the plaintiff in *Oldani*, the plaintiff in the present case disclosed the amount, character and value of property, financial obligations and income, which allowed a fair view of the plaintiff's overall financial picture.[7] There were no children of the marriage, and the agreement provided for no alimony. In short, at the time of the execution of the agreement, the defendant knew, based on the financial disclosure, that the plaintiff had significantly more income than her and, based on the agreement, she knew that she would not be entitled to a share of the plaintiff's resources in the event of a divorce. The plaintiff's 2006 federal income tax return listed on the line "[r]ental real estate, royalties, partnerships, S corporations, trusts, etc. Attach Schedule E" the amount of $394,048. At the July 21, 2011 hearing on the plaintiff's motion to enforce the agreement, the plaintiff's uncontested testimony was that his Schedule E income was derived from South Willington Limited Partnership, a rental real estate, and Cable Technology Incorporated, a small company. On his financial affidavit, which was attached to the agreement, the plaintiff listed under the heading "real estate," South Willington Limited Partnership and listed it as having a value of $500,000. He also listed on the financial affidavit under the heading "other assets," that he was a 50 percent owner of "Cable Technology, Inc.," and listed the value of his ownership interest at $2 million. Although the plaintiff did not expressly provide the defendant with his Schedule E income, he did disclose the sources of his Schedule E income and the value of those sources. The disclosure provided the defendant with a sufficient approximation of the

amount, character and value of the plaintiff's property, financial obligations, and income.

In the circumstances of this case, the defendant was willing to marry the plaintiff, who had substantially greater financial means than she with the full understanding that, pursuant to their agreement, if the marriage did not work out well, she would receive nothing on the dissolution of their marriage. We have been provided with no legal justification for a finding of unconscionability. Accordingly, the defendant's claim of error is without merit.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] Cf. General Statutes § 46b-36g (b) (if enforcement of prenuptial agreement would result in person's becoming eligible for public assistance, court may require party to provide support regardless of terms of agreement).

[2] At the time of dissolution, the court stated that it was not making a separate finding regarding the enforceability of the agreement and that the "decision to have the . . . agreement enforced today has largely to do with the fact that that was litigated before Judge Fuger on an earlier occasion."

[3] "Prenuptial agreements entered into prior to October 1, 1995, however, are governed by the common law, which [was] analyzed in *McHugh* v. *McHugh*, [181 Conn. 482, 436 A.2d 8 (1980)]." *Bedrick* v. *Bedrick*, 300 Conn. 691, 700, 17 A.3d 17 (2011). The Connecticut Premarital Agreement Act "was intended to clarify *McHugh*, not to supplant the legal principles espoused therein. . . . [T]he [Connecticut Premarital Agreement] [A]ct endorses, clarifies and codifies the *McHugh* standards . . . ." (Citations omitted; internal quotation marks omitted.) *Friezo* v. *Friezo*, 281 Conn. 166, 186 n.23, 914 A.2d 533 (2007).

[4] Significantly, the agreement expressly recognized the inequality of financial resources between the parties. Section 1.8 of the agreement provided in relevant part: "Each of [the parties] is cognizant and aware that there is a substantial disparity in the assets and income of the respective parties. Notwithstanding such disparity, however, it is the intention of each of the parties that, upon their marriage, the consequences of this Agreement shall be binding upon the parties . . . ."

[5] We see no functional difference, for the purpose of analyzing the issue at hand, between postnuptial and prenuptial agreements.

[6] We conclude that Judge Fuger did not err in ruling on November 29, 2011, that the agreement was enforceable and did not err in denying the defendant's motion to reargue. We, therefore, need not address separately the propriety of Judge Boland's incorporation of Judge Fuger's November 29, 2011 decision into the judgment of dissolution.

[7] Although more pixels in the picture may have been preferable, the disclosure revealed assets that fairly obviously produced income, the defendant was represented by counsel, and the defendant, by opting for no alimony, showed no interest in fine-tuning the agreement. Pursuant to § 6.4 of the agreement, each party had "been given the right to request additional documents from [the other] regarding [the other's] financial status and to obtain independent valuations or appraisals."